THIRD DIVISION
May 23, 2007

No. 1-05-2154

| | | |
|---|---|---|
| KRZYSZTOF SOBCZAK, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MOTORS CORPORATION, | ) | Honorable |
| | ) | Carol P. McCarthy, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff Krzysztof Sobczak (Sobczak) filed suit against defendant General Motors Corporation (GM). His fourth amended complaint alleged five counts against GM: strict product liability (count I), negligence (count II), *res ipsa loquitur* (count III), breach of express warranty (count IV), and breach of implied warranty (count V). The trial court directed verdicts for GM on counts II, III, IV and V. The trial court also directed a verdict for GM with respect to part of Sobczak's strict liability claim (count I), but allowed a portion of that claim to reach the jury. After hearing all of the evidence, the jury found in favor of GM. Sobczak now appeals. For the following reasons, we

reverse and remand.

Sobczak filed a fourth amended complaint containing 31 counts against seven defendants, GM, Rizza Chevrolet, Gemini Conversions, Inc., and four manufacturers of automotive parts, for injuries he sustained as a result of a fire that ignited in his YF7 configured 1999 Chevy Astro M/L van. Prior to trial, Sobczak's claims against six of the defendants were either dismissed or settled. Sobczak proceeded to trial against GM only.

At trial, Sobczak sought to prove that GM defectively designed the heat shields, muffler and fuel management system for the YF7 configured M/L van and negligently designed the van's heat shields. At the conclusion of Sobczak's case in chief, GM presented a motion for a directed verdict and the trial court entered directed verdicts in favor of GM and against Sobczak on Sobczak's negligence, *res ipsa loquitur*, express warranty and implied warranty counts. With regard to Sobczak's strict liability claim, the trial court directed a verdict for GM except with respect to the alleged design defect concerning the fuel management system.

Following the presentation of the evidence by GM, the jury returned a verdict in favor of GM and against Sobczak on the remaining count. This timely appeal followed.

BACKGROUND

At about 9 p.m., on August 28, 1999, Sobczak drove his father's Chevrolet Astro van (YF7 configured, M/L model) to pick up his cousin Arthur. Sobczak and Arthur went to two nightclubs over the course of several hours. Sobczak consumed at least

five beers in that time period. Sobczak and his cousin left at 2 a.m., and went back to Sobczak's house. At 4:30 a.m., Arthur woke Sobczak so that Sobczak could drive him home.

After dropping off Arthur, Sobczak noticed that the van was sluggish and was making noises. He turned onto 51st Street to avoid traffic on Archer Avenue. The car stalled on 51st Street and Sobczak tried to start the car by putting the transmission into neutral and turning the key. The car started but the motor sounded like it was "jumping up and down." Sobczak put his foot on the brake pedal and put the van in gear, but the motor died. This occurred about 10 times in 10 minutes. Sobczak started the van once more but smelled something coming from the back. He climbed over the seat and went to the back bench seat. He knelt on the bench seat and started to check around when the seat exploded into flames. His shirt and hair caught on fire. He felt his way back to the driver's seat and tried to open the door. The next thing Sobczak could recall was waking up in the hospital one month after the accident. Sobczak could not recall how he ended up in the passenger seat where firefighters found him nor whether he attempted to unlock the van's doors.

Several residents saw the van on fire. Jan Wyka was getting ready for work when he heard a bang. He went to the window and saw both smoke and flames coming from beneath the van. Wyka's daughter called 911 and Wyka attempted to put out the fire using his garden hose but it was too short. As Wyka approached the van, he heard a loud bang and glass breaking. He retreated because the flames became

too intense.

Michael Dinkel was sleeping on the morning of August 28, 1999, but was awakened about 6 a.m. by a loud noise. Dinkel went outside and saw the van on the street. As he was looking at the van, the exhaust system began glowing red and the van ignited. Firefighters arrived at the scene and Dinkel saw them break the passenger side window, unlock the door and remove Sobczak.

David Atkocaitis, a lieutenant with the Central Stickney Fire Department, responded to the fire involving Sobczak. Upon arriving at the scene, he was notified that the driver was still inside the van. He approached the van to look inside and did not see flames but felt a lot of heat and saw a lot of smoke. After the window of the van was broken, Lieutenant Atkocaitis could see Sobczak on the front passenger seat of the van. Sobczak was removed from the van and transported by ambulance to McNeal Hospital.

Dr. Richard Gamelli, the director of Loyola Hospital's burn center, treated Sobczak after he was transferred from McNeal Hospital. Sobczak had burns over 40% of his body, including severe burns to his face, neck, right arm and hand, left arm, back and thighs. A toxicology screening done at Loyola at 7:24 a.m. on August 28, 1999, showed Sobczak's blood alcohol level to be .157.

John Orisini, the head of the fire and arson investigative unit for the Cook County sheriff's police, testified that he was assigned to investigate the Sobczak van fire to determine the cause of the fire. Orisini determined that the fire started near the

rear tire on the passenger side. He drew this conclusion based on the fact that the metal in that area was exposed and whitening occurred. There was also evidence of heavy burning in the area of the kickup and the rear wheel. The carpet padding in front of the two rear seats was completely burned away. Normally, the carpet would not burn away unless the heat was coming from underneath the padding or a flammable liquid was used. Orisini found no evidence of a flammable liquid. Based on his investigation, Orisini concluded that the fire started underneath the van either in or near the muffler and the heat had conducted up through the flooring and traveled inside the van. Orisini observed a hole in the muffler at the seam and saw that the aluminum heat shield had melted off.

Dennis Himmler is a GM senior staff engineer who has investigated over 1,000 vehicle fires. Himmler inspected Sobczak's van on two occasions prior to trial. Based on his inspection, Himmler testified that overheating in the exhaust system in the van could have only occurred gradually. The exhaust system could not have overheated simply by starting the engine, allowing it to idle or revving it several times. The only way the exhaust system could have overheated would be by repeated acceleration of the engine to 5600 revolutions per minute (RPM), the level at which the built-in rev limiter would have engaged and slowed the engine. This constant RPM cycling would have overwhelmed the catalytic converter and the exhaust system would have overheated and started transferring heat to other components within 10 minutes.

Himmler found evidence that the exhaust system overheated from RPM cycling:

(1) the exhaust system components had "blued"; (2) the muffler had opened at the seam; (3) the heat shield attached to the muffler had melted; and (4) there were carbon deposits on the spark plugs. According to Himmler, Sobczak should have been alerted to the overheating by the loud noises and the smoke that would have been emanating from the van.

Charles Raber testified that he has been employed by GM since 1978 and is the lead design engineer for the full-size truck platform fuel system. From 1996 to 1999, he was a staff project engineer and worked on the M/L van fuel systems. Tests are performed on GM vehicles to make sure that vehicles released to the public are safe. One of the tests performed on a vehicle is an underbody temperature test. This type of test provided information regarding the fuel system and other systems in the vehicle. Temperature bogeys or overtemperatures are temperature levels that GM has set and determined should not be exceeded during the underbody temperature test. If a temperature bogey is exceeded, it is reviewed by GM engineers.

DIRECTED VERDICTS

Sobczak first argues that the trial court erred in directing verdicts in GM's favor. Specifically, Sobczak claims that the trial court erred in directing a verdict with respect to his strict liability claim relating to the van's heat shielding and with respect to his negligence claim based on the van's insufficient heat shielding.

During oral argument, GM argued that Sobczak raised the issue that GM's YF7 configuration was defectively designed, in that GM removed the tailpipe and muffler

heat shields and chose to insulate those areas with insulated carpet padding, for the first time on appeal. Our review of the record in this case leads us to a contrary conclusion that we will discuss at length in our discussion of Sobczak's claims.

At trial, Sobczak pursued his claims for negligence and strict products liability based on design defect. Sobczak's theory of the case was that GM had (1) defectively designed the van's heat shields, muffler and fuel management system; and (2) negligently designed the van's heat shields. Specifically, Sobczak's case rested on the testimony of numerous GM employees, as well as two expert witnesses, Donald Rudny and Charles Colver.

David Ukrop testified that from 1997 to 1999 he was an engineering group manager at GM. He was responsible for three functions-design, validations and release. In other words, he was responsible for the design of the muffler for the exhaust system, testing of the design, and mainstreaming the design. If for some reason the design did not pass a test, a report would be issued. That product would be retested and would not be allowed to go into the stream of commerce until it passed.

One of the Astro van configurations, the YF7 configured M/L van, the same van purchased by Sobczak's father, was for recreational vehicle upfitters. These vehicles were marketed to families. The YF7 configured van lacked two heat shields, the body-attached muffler heat shield and the tailpipe heat shield, that were included on other configurations of 1999 Astro van. Ukrop agreed that the absence of the tailpipe heat shield and the body-attached muffler heat shield would expose those areas to greater

heat than models that had those heat shields.

A design failure mode effects and analysis (DFMEA) is a process whereby GM determines what would happen if certain parts of the exhaust system failed and what hazards would be caused by the failure. Ukrop testified to a DFMEA that evaluated the loss of the insulation capability of the muffler body-attached heat shield. GM determined that the cause and effect would be underbody components overheating, smoke, steam or fire and/or the components can deform, melt, boil, etc.

Kevin Horton testified in an evidence deposition that he worked for GM developing the thermal aspects of products, including the M/L van. Horton initiated a report in connection with thermal testing of the YF7 configuration of the M/L van relating to the floorpan overtemperature condition. The thermal testing also showed overtemperature limits for the bottom of the foam near the kickup and the surrounding area. When Horton issued this report, he was aware that one of the paths of fire into the passenger compartment is via heat transfer from metal structures, such as the floorpan, to combustible materials in contact with the floorpan, such as foam carpet padding. Horton was also aware that if an overtemperature condition occurred for the foam padding for the carpet, a safety concern would exist that would need to be addressed.

Horton received a response to this report that indicated the insulation mat underneath the foam pad absorbed any heat being transferred from the metal floor to the carpet. However, only portions of the floorpan were covered with the insulation

material. Consequently, the response did not fully address the concern of overtemperature conditions of the foam mat.

Horton also testified that he understood that the YF7 configuration of the M/L van was missing the muffler heat shield and the tailpipe heat shield. Horton testified that these heat shields were required to limit temperatures in the passenger compartment of the van. GM was aware that there was a potential for overtemperature conditions of the foam pad.

Antoinette Jablonski testified that she worked in the exhaust system area for GM during 1997-98 and worked on M/L vans. During that time, warranty claims were being lodged against GM for the YF7 upfitter configuration for a general rattle on the rear heat shield. Jablonski had a conversation with her supervisor regarding the removal of the tailpipe heat shield and the muffler heat shield from the M/L van based on requests from conversion companies trying to accommodate certain seating options. Her supervisor told her that he believed some of the converters were altering those shields or removing them completely, which GM believed to be a safety hazard. If a heat shield is lost or removed, there is a potential for ignition of a vehicle. Body-mounted heat shields would deflect heat downward and would disburse it. GM instructed the converters that they should not modify or alter the exhaust system, including by removal or alteration of the heat shields, because the exhaust system could reach extremely high temperatures under extreme operating conditions.

GM, however, decided to remove the tailpipe heat shield and the muffler heat

9

shield and replace those shields with an insulated mat. The insulated mat was intended to serve as an alternative to the design involving the two rear body-mounted heat shields. Thermal testing of the YF7 configured M/L van showed floorpan overtemperatures. In 1999, when Sobczak's father purchased the M/L van, it was YF7 configured, meaning that it did not have the tailpipe or muffler heat shield.

Linda Kajma testified that she had been employed by GM since 1985. During the period of 1996 to 1998, she was a design release engineer and was responsible for the interior design of the floor coverings for the M/L vans. Although she was not involved in the decision, she was aware that there was a proposal to remove two of the heat shields on the YF7 configuration and use an insulated carpet pad. Upfitters were made aware of the change through a document entitled "Document for Incomplete Vehicle."

At trial, Kajma denied that the carpet pad for the M/L van was made of low-density polyethylene foam despite testifying to the contrary at her deposition. It was designed to go under the carpet used by the upfitters. At her deposition, Kajma testified that the insulation did not underlie the entire foam pad. Instead, there were two squares of insulation; one located above the muffler and one located in the area of the catalytic converter.

Kajma was involved in thermal testing of the YF7 configured design. The testing was performed under different test conditions, including outdoor temperatures. The results included overtemperatures measured at the bottom of the insulation pad at the

muffler front center. In addition, while the vehicle was in idle, almost all the areas where the foam pad was tested had an overtemperature condition. Kajma looked at the foam pad following testing and noticed that it was shiny. Shininess can indicate a form of melting.

Sobczak identified Donald Rudny as an expert witness and disclosed in his answer to Rule 213(g) interrogatories (177 Ill. 2d R. 213(g)) that Rudny would testify that the shielding provided in the muffler area was insufficient because it was made of aluminum rather than ferritic stainless steel. The melting point of aluminum is 1220 degrees, making aluminum a poor choice of material for shielding, given that exhaust gas temperatures exceeding that temperature are foreseeable and would melt an aluminum shield. In addition, Rudny would testify that the insulation intended to replace the removed tailpipe and muffler heat shield in the YF7 configuration were also insufficient to guard against heat transfer to the floorpan.

Prior to Rudny's testimony at trial, GM filed a motion *in limine* to prevent him from testifying that the van's heat shielding was defective because it was made of aluminum rather than stainless steel. Defendant argued that Rudny's testimony should be excluded because Rudny "failed to perform any testing to determine whether a ferritic stainless steel muffler attached heat shield would have better prevented the transfer of heat from the muffler." The trial court granted GM's motion to prevent Rudny from testifying in this regard.

Also prior to Rudny's testimony at trial, the parties and the court had a discussion regarding the remainder of his testimony. Sobczak argued that the motion *in limine* did not prevent Rudny from testifying at trial, as he did in his deposition, that the removal of two of the heat shields in the YF7 configured M/L van left the shielding system insufficient to prevent the ignition of a combustible body, *i.e.*, the foam padding. GM argued that, during the deposition, Rudny never offered an opinion about the heat shielding system other than to opine that it was insufficient because the shields were made of aluminum rather than steel, an issue that the court ruled Rudny could not testify to. The court took the matter under advisement and the parties agreed to revisit the issue in connection with a motion for a directed verdict.

With respect to the heat shielding system, Rudny testified at trial that the standard of care within the engineering industry is "when you indentify a potential hazard that affects the safety to the passengers, you need to guard against that hazard and prevent it from causing some risk or danger to the occupants of the vehicle." He also testified at length regarding a breach in the exhaust system of this particular model where the exhaust gas temperature reached in excess of 1400 degrees. With respect to the heat shields, Rudny testified that the heat shielding needs to be able to withstand those temperatures. Rudny essentially testified that the heat shielding system was defective in two respects. Rudny testified that the M/L van with the YF7 configuration, *i.e.*, the M/L van without all four heat shields, was insufficient because it was not able to withstand the temperatures of the exhaust gas that would be expelling from a breach in

12

the exhaust system. Because this shielding system was inadequate, the standard of care was breached.

Rudny testified that he was aware that, in the 1999 model year, the heat shielding for the upfitter configuration for the M/L van, the YF7 configuration, the tailpipe and muffler body-attached heat shields were removed and replaced with insulation. He further testified that removing the tailpipe and muffler body-attached heat shields and replacing them with insulation decreased the guarding of the heat shield system and would not eliminate the hazard created by the exhaust gas escape. Concluding his testimony, Rudny stated that "the shielding" would have been a proximate cause of Sobczak's injuries.

On cross-examination, Rudny testified that the purpose of heat shielding is "to reduce radiant and convective heat to components that may be subject to combustion or excessive temperatures." If the temperature is high enough, heat transfer can occur, causing the ignition of materials that may lead to a fire. Rudny admitted that with respect to heat management systems, he did not look at a design by another manufacturer for the 1999 model year.

Following Rudny's testimony, GM moved to have Rudny's testimony stricken from the record with respect to the heat shielding system because Rudny failed to identify a standard of care in the automotive industry applicable to the 1999 model year with respect to heat management systems. The court indicated that Rudny failed to articulate a standard of care with regard to the shielding other than saying the shielding

13

was defective because it did not prevent heat from being transferred. However, the court did not rule on GM's motion.

Plaintiff identified Charles Colver as an expert opinion witness in plaintiff's answers to Supreme Court Rule 213(g) interrogatories. Plaintiff disclosed Colver would testify at trial regarding the standard of care; the defects in the van, including the muffler design, heat shielding and air-fuel management system; GM's failure to warn conversion companies of the dangers of removing the heat shields and insulation material; and the cause of the fire. Specifically, Colver would opine that the van's muffler seam was inadequate to withstand foreseeable pressures and should have been welded instead of crimped. Furthermore, Colver would opine that a hole in the muffler was foreseeable but that the YF7 configuration, which removed two heat shields and replaced them with insufficient insulation material, did not provide sufficient protection for the foreseeable high temperatures generated by a hole in the muffler.

During *voir dire,* Colver testified that he has a doctorate in chemical engineering and has studied mathematics, general engineering and mechanical engineering. Colver had published some articles that touched on the issues of combustion and heat transfer and, therefore, had opinions in this case regarding the muffler. Colver went on to explain that a muffler is a vessel which is fabricated to withstand certain conditions. Parameters are established for the operation of the muffler, which is a pass-through vessel. Colver had been involved in numerous cases that have involved vessels and was familiar with the design process of spot welding, banding and supporting vessels.

14

Colver also had an opinion regarding guarding which relates to fuel cutoff. Fuel cutoff is simply a high temperature limit switch that senses temperature at a particular point. This switch produces a voltage which can open or close the valve. In this case, the fuel delivery system valve would be closed when a high temperature is reached. Colver acknowledged that he was unaware of the horsepower of the van and did not know if he had a fuel cutoff valve in his car. He also admitted that he had never designed an exhaust system, had never designed a system for maintaining comfortable floor temperatures in a vehicle, had never designed any vehicle system, had not tested any of the components in this case and had not done any testing on any components in the industry that would be generally relevant to the 1999 model year.

Following *voir dire*, the trial court found that Colver's testimony was "barred on the whole thing" because "[h]e doesn't have competence to testify about this particular vehicle."

At the close of Sobczak's case in chief, the court directed a verdict in favor of GM and against Sobczak with respect to Sobczak's strict liability claim relating to the heat shielding. The court ruled that Rudny's conclusions that: (1) the shielding that was taken off was insufficient; and (2) the shielding that was put on was insufficient, were speculative without having conducted any tests. The court also entered directed findings for GM with regard to Sobczaks'[1] negligence claims relating to the van's fuel

---

[1] A directed verdict was also entered with respect to Sobczak's warranty claims

management system and heat shielding.  The court found that Rudny failed to identify a standard of care within the industry.

A directed verdict should be granted only if all of the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could stand.  *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967).  We review the trial court's order granting a directed verdict to defendant *de novo*.  *Susnis v. Radfar*, 317 Ill. App. 3d 817, 825-26 (2000).

### 1. Strict Liability

A plaintiff may establish a strict liability claim based on a design defect in one of two ways; the consumer-expectation test or the risk-utility test.   *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 255 (2007), citing *Lamkin v. Towner*, 138 Ill. 2d 510, 528 (1990). The consumer-expectation test provides that a product is "unreasonably dangerous" when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."  Restatement (Second) of Torts §402A, Comment *i*,

---

but Sobczak did not dispute the propriety of that ruling in the trial court, nor does he raise that issue before this court.  Similarly, Sobczak does not dispute the trial court's ruling directing a verdict for GM on his *res ipsa* count but states that the trial court granted the motion on that count because it found that Sobczak could not prove simple negligence.

at 352 (1965).

Under the risk-utility test, a plaintiff must demonstrate that a design defect exists by presenting evidence that the risk of danger inherent in the design of the product outweighs the benefits of the design. *Lamkin*, 138 Ill. 2d at 529. In other words, "[t]he utility of the design must therefore be weighed against the risk of harm created" and "[i]f the likelihood and gravity of the harm outweigh the benefits and utilities of the product, the product is unreasonably dangerous." 63A Am. Jur. 2d *Products Liability* §978, at 146-47 (1997).

Sobczak claims that he sought to establish at trial that the van's heat shields were defective because the particular design configuration of the van, the YF7 configuration, eliminated two heat shields found on other GM models and because the heat shields were made of aluminum rather than steel. Sobczak was prevented from pursuing the latter theory because Rudny's testimony on this issue was precluded by the court's granting of GM's motion *in limine*.

### a. Consumer-Expectation Test

Sobczak argues there was sufficient evidence presented to establish that his injuries were the result of the unreasonably dangerous condition of the van at the time the van left GM's control. Sobczak asserts that admissions made by several of GM's engineers who were involved in the design of the YF7 configuration and the release of that design to the public established that the van's heat shielding was defective. GM responds that Sobczak did not introduce any evidence to establish that the heat

17

management system should have been able to withstand the extreme conditions generated by abnormal use, *i.e.*, Sobczak's continued revving of the engine.

As previously stated, a plaintiff may prevail under the consumer-expectation test if he or she can demonstrate that the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Calles*, 224 Ill. 2d at 256. There was some discussion at oral argument as to whether the plaintiff must establish a design defect prior to the application of the consumer-expectation test. A plain reading of the language in *Calles* leads us to find that the plaintiff need not. Further support for our conclusion comes from *Johnson v. Amerco*, 87 Ill. App. 3d 827 (1980), wherein the court relied on the principal that "[a] *prima facie* case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the absence of abnormal use or secondary causes the product failed to perform in the manner reasonably to be expected in light of its nature and intended function." *Johnson*, 87 Ill. App. 3d at 829.

The purpose of the heat shielding system is to disburse and deflect any heat created from the operation of the vehicle away from the vehicle. Numerous employees of GM testified that the YF7 configuration of the M/L van had a different heat shielding system than other models of the 1999 Astro van. While other models of the Astro van had four heat shields, the YF7 configuration only had two. In place of the tailpipe and muffler heat shield, GM chose to use insulated foam matting to be placed under the carpet installed by the upfitters. This foam matting was designed and tested by GM.

18

Upon application of high temperatures during thermal testing, the foam matting exhibited signs of melting. Rudny testified that removing the tailpipe and muffler body-attached heat shields and replacing them with insulation decreased the guarding of the heat shield system and would not eliminate the hazard created by the exhaust gas escape.

Clearly, an ordinary consumer purchasing an M/L van would give little or no thought to the heat shielding system selected by GM, but would expect that little or no heat would be transferred from underneath their YF7 configured M/L van into the vehicle compartment.

The question is whether Sobczak used the M/L van, *i.e.*, the heat management system, in a reasonably foreseeable manner. That is, should GM have contemplated and tested the safety of YF7 configuration to determine if it could withstand certain temperatures created by foreseeable operations? Contrary to GM's assertions, we believe that the answer is yes. It is difficult to say that Sobczak's use of the M/L van was abnormal or unreasonable or unforeseeable. It is reasonably foreseeable that if the M/L van stalled, an ordinary consumer would make numerous attempts to restart the van without much thought as to whether the heat shielding system would withstand the high temperatures that may be created by revving the engine. Specifically, an ordinary consumer would expect his M/L van either to start or not to start, but would not expect the interior of the van to ignite.

A directed verdict should be granted only if all of the evidence, viewed in the

light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We do not believe that the evidence presented on this issue so favored GM as to preclude a verdict for Sobczak.

### b. Risk-Utility Test

Sobczak argues that, in the alternative, he was required to show that the van's design proximately caused his injury and " 'on balance, the benefits of the challenged design outweigh the risk of danger inherent in such designs.' " *Blue v. Environmental Engineering Inc.*, 345 Ill. App. 3d 455, 466 (2005), quoting *Lamkin*, 138 Ill. 2d at 529. Sobczak asserts that he introduced extensive evidence from which the jury could have concluded that the defective heat shielding was the proximate cause of his injury.

Because we have determined that the trial court improperly directed a verdict for GM on the issue of strict liability relating to the van's heat shielding, we need not analyze Sobczak's claim under the risk-utility test. However, in reading the portion of the record containing the trial court's findings on GM's motion for a directed verdict, it is clear that the trial court failed to ultimately consider that, in addition to his opinion that the heat shields should have been made of ferritic steel rather than aluminum, Rudny also opined that the heat management system, *i.e.*, the YF7 configuration, was insufficient to withstand the high temperatures that would be potentially created by the failure of the exhaust system.

### 2. Negligence

To establish a product liability action on a claim based on negligence, "a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages." *Calles*, 224 Ill. 2d at 270. A product liability claim rooted in negligence is concerned with both defendant's fault and the condition of the product. *Coney v. J. L. G. Industries, Inc.*, 97 Ill. 2d 104, 117 (1983).

"A manufacturer has a nondelegable duty to produce a product that is reasonably safe for all intended uses." *Hansen v. Baxter Heathcare Corp.*, 198 Ill. 2d, 420, 433 (2002). The crucial questions are whether the manufacturer exercised reasonable care in the design of the product and " ' whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone.' " *Calles*, 224 Ill. 2d at 271, quoting American Law of Products Liability 3d §28:48, at 28-66 (1997). A plaintiff must show that the manufacturer knew or should have known of the risk posed by the design at the time of the manufacture to establish that the manufacturer acted unreasonably based on the foreseeability of harm. *Calles,* 224 Ill. 2d at 271.

As discussed in the strict liability section, there was enough evidence with respect to whether the design of the heat management system of the M/L van was defective to preclude a directed verdict. Similarly, there was enough evidence presented with respect to foreseeability , *i.e.*, GM's knowledge of the potential risks posed by the YF7 configured heat shielding system, that enough questions exist as to

21

whether GM exercised reasonable care in the design and manufacture of the heat shielding system of the YF7 configured M/L van to prevent the directing of a verdict in GM's favor.

Furthermore, we do not agree with the trial court's finding that Sobczak's expert, Donald Rudny, failed to identify specific industry standards of care for the particular defects he attempted to identify. David Ukrop, testified to a similar, if not identical, standard of care in the engineering industry.

## JURY'S VERDICT

Sobczak next claims, in less than one page, that the jury's verdict was against the manifest weight of the evidence. However, Sobczak's conclusory and undeveloped argument does not meet the requirements of Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)). The lack of development leads to waiver of the issue. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 353 Ill. App. 3d 197, 213 (2004).

## EVIDENTIARY ISSUES

Sobczak claims that the trial court abused its discretion on several evidentiary issues: (1) in refusing to exclude evidence of Sobczak's intoxication; (2) in allowing GM to refer to intoxication evidence during opening statements; (3) excluding the testimony of Charles Colver; and (4) excluding portions of Donald Rudny's testimony. We are aware that resolution of these evidentiary issues may be irrelevant, given the fact that we are remanding this case to the trial court on other issues, but resolve them nonetheless.

22

Plaintiff first argues that the court erred when it denied his motion *in limine* seeking to bar Dr. Long's testimony regarding Sobczak's intoxication or referencing blood alcohol levels.

"Evidence of a plaintiff's intoxication is relevant to the extent that it affects the care that he takes for his own safety and is therefore admissible as a circumstance to be weighed by the trier of fact in its determination of the issue of due care." *Marshall v. Osborn*, 213 Ill. App. 3d 134, 140 (1991). Although highly probative, evidence of alcohol consumption is also extremely prejudicial; therefore, "actual intoxication must be established, indicating physical or mental capabilities." *Sandburg-Schiller v. Rosello*, 119 Ill. App. 3d 318, 331 (1983); *Bielaga v. Mozdzeniak*, 328 Ill. App. 3d 291, 296 (2002). Intoxication is a question of fact for the jury to determine. *Sandburg-Schiller*, 119 Ill. App. 3d at 331, 456 N.E.2d at 202. Where there is no evidence of intoxication, evidence of consumption of alcohol is considered irrelevant but such irrelevant evidence is not grounds for reversal unless it prejudiced the jury's verdict. *Bielaga*, 328 Ill. App. 3d at 296. The admission of evidence is within the discretion of the trial court and we will not reverse the trial court unless that discretion was clearly abused. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993).

More than mere drinking was shown here. Dr. Christopher Long, a forensic toxicologist, provided expert testimony based on blood alcohol level tests that Sobczak was intoxicated at the time of the accident. Expert testimony and evidence from blood alcohol tests are admissible to establish intoxication. *Wade v. City of Chicago Heights*,

23

295 Ill. App. 3d 873, 886 (1998), following *Marshall*, 213 Ill. App. 3d at 141. Dr. Long testified that Sobczak's blood alcohol was tested at 7:24 a.m., approximately 90 minutes after the incident, at Loyola Hospital and showed that Sobczak had a blood alcohol level of .157. At the time the testing was done, Sobczak was intoxicated.

Dr. Long was asked to conduct a retrograde analysis to determine what Sobczak's blood alcohol level would have been at 6 a.m. that same morning. To make this determination, Dr. Long looked at the time of the blood draw, the blood concentration, the time of the accident and what Sobczak stated in his deposition that he was doing just prior to the incident. Based upon all of this information, Dr. Long opined that at 6 a.m. that morning, Sobczak's blood alcohol level would have been .184.

A person with a blood alcohol level of .184 would be significantly impaired, suffering conditions including mental confusion and loss of gross motor control, and could become sedentary or sleepy. One could expect to find that level of blood alcohol in a person who had consumed 12 to 18 beers over the course of the evening. Dr. Long opined that Sobczak's movements around the vehicle after he smelled something burning, his position in the front passenger seat and his failure to exit the van prior to the fire all demonstrate Sobczak's mental confusion. Dr. Long concluded that Sobczak's failure to exit the van was due to the severity of his intoxication.

Dr. Long testified to a reasonable degree of medical certainty that Sobczak's blood alcohol level was .184 at the time of fire and this level of intoxication would have

24

impaired his critical judgment and motor control. This information was highly relevant to the issue of whether Sobczak's injuries were caused by a condition of the van or by Sobczak's operation of the van while intoxicated. Consequently, we find that the trial court did not abuse its discretion in denying Sobczak's motion *in limine* to exclude such evidence.

Plaintiff next contends that he was denied a fair trial when defense counsel made improper comments during his opening statement that seriously prejudiced plaintiff. Specifically, plaintiff states that defense counsel improperly remarked on the number of beers that plaintiff consumed the evening of the incident. A review of the record in this case shows that plaintiff failed to object to the comments made and therefore has waived this issue. *Hilgenberg v. Kazan*, 305 Ill. App. 3d 197 (1999).

Sobczak next argues that the trial court erred in excluding the testimony of Charles Colver and portions of the testimony of Donald Rudny. Sobczak claims that the exclusion of Colver's testimony was devastating to his case where he would have established the existence of a design defect in the muffler and would have bolstered and expanded upon Rudny's opinions regarding the design defects in the van's heat shielding and fuel management systems. Further, Sobczak urges, Colver would have established the proximate cause of the fire. Sobczak also argues that portions of Donald Rudny's testimony were improperly excluded where Rudny would have testified that the van's muffler-attached heat shield was defective because it was made of aluminum and would have opined regarding an alternative design using ferritic steel. A

25

lengthy recitation of Colver's and Rudny's testimony was included in the "directed verdict" section.

Expert testimony is admissible if the expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence. *Turner v. Williams*, 326 Ill. App. 3d 541, 552 (2001). A circuit court's ruling on the admissibility of expert testimony will not be disturbed absent an abuse of discretion. *Carlson v. City Construction Co.*, 239 Ill. App. 3d 211, 239 (1992). Following *voir dire*, the trial court found that Colver's testimony was "barred on the whole thing" because "[h]e doesn't have competence to testify about this particular vehicle." The court further stated that in accordance with *Volpe v. Iko Industries, Ltd.*, 327 Ill. App. 3d 567 (2002), Colver would be barred from testifying because, "[h]e doesn't even know how big of an engine it is. He hasn't done any testing. He's never designed any systems. He has an opinion about the muffler. The muffler, he has never looked at." In addition, the court excluded portions of Rudny's testimony finding that Rudny failed to articulate a standard of care in the industry. Sobczak argues that the trial court misunderstood the holding in *Volpe* to stand for the proposition that Colver's and portions of Rudny's testimony were inadmissible unless they had personally performed tests as a basis for their opinions.

In *Volpe*, the plaintiff filed suit against the defendant alleging product liability claims after the plaintiff was severely burned while at work when the top of an oxidizer tank blew and hot asphalt spewed out of the ruptured openings and onto the plaintiff.

26

Prior to trial, the defendant filed a motion to strike an expert's opinion testimony on the basis that the expert was not qualified to render an opinion regarding the oxidizer tank's design. The defendant argued that the expert admitted that he had never designed or seen an oxidizer tank or a deflector device. The defendant also argued the expert's testimony should be stricken because he was of the wrong professional discipline and was not qualified to render an opinion regarding the oxidizer tank's design. The plaintiff responded and argued that the expert was qualified to render an expert opinion regarding the oxidizer tank at issue given his experience with tanks and vessels that hold chemicals. The plaintiff further argued that the expert should be allowed to comment on the configuration of the piping because it could explain how the rupture occurred.

The *Volpe* court found the trial court did not abuse its discretion in excluding the expert testimony because the expert opined that the product was defective because it lacked an alternate design without having built a prototype or conducted any tests. *Volpe*, 327 Ill. App. 3d at 577. Furthermore, the court found that the expert admitted that he had not designed a deflector device of the type he testified should have been installed on the tank and had never seen such a device.

We find this case distinguishable from *Volpe*. In *Volpe,* the trial court excluded the testimony of the expert because it was based solely on his opinion and not on any conclusive testing. In the case at bar, both experts testified that, although they did not conduct their own tests, their opinions were based on the review of the tests conducted

27

by GM.  Charles Colver disclosed in the interrogatories and during *voir dire* that he had based his opinion on his experience and education, various treatises, testing conducted by GM and GM's publications.  Similarly, Rudny testified that his opinions were based on his training and expertise and on specific testing performed by GM.  It is both experts' reliance on the testing conducted by GM that allows us to conclude that the trial court may have abused its discretion in excluding Colver's testimony and portions of Rudny's testimony.

Under the circumstances presented here, if Sobczak attempts to introduce Colver and Rudny as experts on remand, we instruct the trial court to reconsider its ruling in regard to excluding their testimony under *Volpe*.  However, we find that the trial court correctly prevented Rudny from testifying as to his opinion that there was no change to the condition of Sobczak's vans' air-fuel control system from the time it left GM to the time of the accident.  This conclusory opinion was unsubstantiated and speculative because Rudny had no personal knowledge regarding the time period between when the van left GM's control and when the accident occurred.

## CONTRIBUTORY NEGLIGENCE

Finally, Sobczak contends that the trial court erred in instructing the jury with regard to his contributory negligence.  Sobczak argues that the trial court improperly instructed the jury to find GM not liable if it found that his contributory negligence comprised "more than 50% of the total proximate cause of [his] injury or damage."
It is within the trial court's discretion to determine which instruction shall be given to the

28

jury and the exercise of that discretion will not be disturbed on review unless it has been clearly abused. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 464 (2001). We see no such abuse of discretion here.

Section 2-1116 of the Code of Civil Procedure provides:

"In all actions on account of bodily injury or death or physical damage to property, based on negligence, or product liability based on strict tort liability, the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury or damage for which recovery is sought. The plaintiff shall not be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is not more than 50% of the proximate cause of the injury or damage for which recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of fault attributable to the plaintiff." 735 ILCS 5/2-1116 (West 1994).

In the instant case, the trial court instructed the jury in accordance with the plain text of section 2-1116 and consequently permitted the jury to consider any and all evidence of fault that may be attributable to Sobczak.

Based on the foregoing discussion, we reverse and remand this cause to the trial court for proceedings consistent with this opinion.

Reversed and remanded.

THEIS, P.J., and CUNNINGHAM, J., concur.